# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

  v.                                                            Case No. 10-CR-90

**ADRIENNE JONES**
        **Defendant.**

## DECISION AND ORDER

The government charged defendant Adrienne Jones with possessing a firearm as a felon, 18 U.S.C. § 922(g)(1), and possessing marijuana with intent to distribute, 21 U.S.C. § 841(a)(1) & (b)(1)(D). Defendant moved to suppress the marijuana, which law enforcement officers seized while executing a search warrant at defendant's residence.[1] Defendant argued that the officers exceeded the permissible scope of the warrant – which listed firearms but not controlled substances – by bringing a drug-sniffing dog into the residence. The dog alerted to a container in the residence, which officers opened, discovering suspected marijuana.

The magistrate judge handling pre-trial proceedings in this case concluded that use of the dog exceeded the authorized scope of the search, rejected the government's inevitable discovery argument, and recommended that the motion be granted. The government objected to the recommendation, obligating me to review the matter de novo. See Fed. R. Crim. P. 59(b). The district judge may on such review "accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions." Fed.

---

[1] He did not move to suppress the firearm, which the officers also seized pursuant to the warrant.

R. Crim. P. 59(b)(3).

Defendant did not request an evidentiary hearing before the magistrate judge, and the parties argued the motion based on the (ostensibly undisputed) facts set forth in defendant's brief. However, the government in its objections requested a de novo hearing, arguing that the magistrate judge incorrectly found that the police had completed their search for the items listed in the warrant before the dog was brought in. I concluded that further evidence would be helpful in resolving the motion and thus held an evidentiary hearing, at which the government presented testimony from the officer who applied for and primarily executed the warrant in this case.

## I. FACTS

### A. The Search Warrant Application

Milwaukee Police Officer Jon Osowski received information from a confidential informant that within the last thirty days the informant observed a semi-automatic pistol inside defendant's residence in defendant's possession during marijuana transactions and on another occasion within ten days. The informant further stated that defendant uses the residence as a drug house to keep his illegal activities secret from his probation officer and law enforcement. (Osowski Aff. [R. 9-2] at 2 ¶ 4.) Osowski confirmed that defendant was a convicted felon, with a previous conviction for possession of marijuana with intent to deliver. (Id. ¶ 5.) Based on this and other information set forth in the affidavit, Osowski asserted that there was probable cause to believe that evidence of the crime of felon in possession of a firearm was located in the residence. (Id. at 4-5 ¶ 13.) A Milwaukee County Circuit Court Commissioner agreed and issued a no-knock warrant to search for (1) firearms, ammunition, and magazines; (2)

documents, utility bills, keys, mail, cell phones, and other items used to show who is in control of the premises; and (3) firearm manuals, cleaning kits, and cases. (Search Warrant [R. 9-1] at 1.) Osowski did not seek – and the Commissioner did not grant – permission to search for drugs.

**B.    Search Warrant Execution**

Osowski testified that he obtained the warrant on April 9, 2010, and executed it on April 12, 2010. (Sept. 29, 2010 Evid. Hr'g Tr. [R. 29] at 6.) He indicated that he did not include marijuana as an item to be seized because the informant's observation of drugs occurred more than 72 hours before the application, outside the window permitted by state court convention. (Tr. at 6.) Nevertheless, based on his investigation, he believed it likely he would find marijuana in defendant's residence. (Tr. at 6.)

Osowski arrived at the residence at about 8:00 a.m. on April 12, observing that defendant's car was there. Osowksi had previously learned that defendant had outstanding arrest warrants, and he formulated a plan pursuant to which officers would, if defendant left the residence, initiate a traffic stop, take him into custody, advise him of the search warrant, and then return to the residence to complete the search. (Tr. at 7-8.) Osowski advised his partner, Michael Wawrzyniakowski, and another assisting officer (Ayala), of his observations, they responded and set up surveillance, and Osowski moved his squad away from the residence. (Tr. at 8.)

At about 12:15 p.m., Wawrzyniakowski and Ayala advised Osowski that defendant, accompanied by an adult woman and a small child, had driven away from the residence. Osowski initiated a traffic stop about two blocks from the residence, removed defendant from

3

the car, arrested him, advised him of the search warrant, and indicated that they would be returning to the residence to execute it. (Tr. at 8, 31, 36.) Officer Christina Smith and her canine, Emo, arrived on the scene as back-up, and Owowski and his partner transported the woman, Symphony Haley, and the child back to the residence to execute the warrant, while Smith waited with defendant for a conveyance. (Tr. at 8-9, 14.)

Osowski and Wawrzyniakowski returned to the residence at about 12:30 p.m., forced open the door, and placed Haley and the child in the kitchen while they cleared the residence. The officers found no one present, but Osowski did, during the sweep, notice a digital scale with marijuana residue on a computer table in the living room. (Tr. at 10, 11, 14, 36; Govt. Ex. 1 at 5.) The officers then proceeded to search the residence, with Wawrzyniakowski finding a gun in a gun case near a laundry hamper in the master bedroom closet. (Tr. at 18, 45; Govt.'s Ex. 1 at 11-12.)

At about 12:45 p.m., Officer Smith and her canine responded to the scene, a conveyance having arrived for defendant. (Tr. at 14, 37.) By that point, the officers had found the firearm and the scale, but nothing else incriminating. (Tr. at 48.) Osowski testified that at the time of Smith's arrival he was taking photos of the firearm, and Wawrzyniakowski was standing with Haley in the kitchen. (Tr. at 15.) Smith asked Osowski if he wanted her to bring the dog in, and he agreed, directing her to the master bedroom where they had found the gun. (Tr. at 48-49.) Osowski testified that, if he had not seen the scale and residue, he did not think he would have asked Smith and Emo to help because Emo had nothing to do with the items on the warrant; he was a drug-sniffing dog. (Tr. at 49-50.) Osowksi further testified that he did not consider seeking court approval to use the dog (Tr. at 50-51), and that the determination to bring in the dog was a "collective decision" (Tr. at 47).

4

The officers put Haley's cat in the first floor bathroom (Tr. at 14), and Wawrzyniakowski explained to Haley that a dog would be coming in to check the residence for narcotics (Tr. at 16). The dog was on a leash, and it did not bark at Haley or the child. Osowski directed Smith to the master bedroom, where he had located a firearm; he also advised her that he had observed marijuana residue on the scale and directed her to also scan the living room area. (Tr. at 17, 51-52.) Haley did not object to the dog or express any fear, and the dog was in the residence for about fifteen minutes. (Tr. at 18.)

Smith took the dog to the bedroom where the gun had been found, and the dog alerted on a trash can near the TV stand. Osowski removed the lid of the trash can and observed three bags of suspected marijuana. (Tr. at 20-21; Govt.'s Ex. 1 at 13.) Osowski testified that although they had already found the gun, his search of the bedroom was ongoing at the time the dog entered the room. (Tr. at 56, 70.) Smith then took the dog to the living room area where Osowski had previously seen the scale, and the dog alerted to where the scale was and to a shelf. Osowski checked the shelf and found a small bag of marijuana. (Tr. at 21, 57; Govt.'s Ex. 1 at 14-15.)

Osowski testified that, as a general matter, when executing a search warrant he looks in every container where the subject evidence might be found, as well as in shoes, ceiling tiles, and vents. He also looks for identifiers linking the suspect to the residence. (Tr. at 22.) He thus checks the garbage for old bills, receipts, or anything with the target's name on it. Osowski explained that whenever the warrant lists "indicia of occupancy" he always goes through the garbage. (Tr. at 24-25, 68.) He testified that in this case he searched the garbage containers in rooms other than the master bedroom, and that he would have searched the receptacle in that room as well even if the dog had not been present; he had not yet done so

5

at the time the dog hit on the container. (Tr. at 25, 71.)

Osowski testified that in this case the warrant permitted a search for firearms, ammunition, and magazines, as well as indicia of occupancy, and he searched nowhere those items could not be found; nor was the dog permitted to go anywhere such evidence could not be located. (Tr. at 23; 25.) When asked why he used the dog in this instance, Osowski explained that after he observed the scale and residue it heightened his awareness to the presence of drugs, and the dog allowed him to expedite the search. He likened the dog to a tool that allows officers to more quickly locate drugs, without destroying property. (Tr. at 25-26.) Osowski denied having any plan to use the dog prior to arresting defendant and clearing the residence. Rather, the decision to use the dog was made only when Officer Smith, on her own initiative, decided to travel to the residence after defendant's conveyance arrived; Osowski denied asking her to come to the residence to assist in the search. (Tr. at 31-32.) Once she arrived, however, Osowski found it convenient to use the dog given his observation of marijuana in plain view while clearing the residence. (Tr. at 33.)

Officer Ayala received the drugs Osowski found, but the only officers involved in the actual search were Osowski, Wawrzyniakowski, and Smith and her dog. (Tr. at 34.) The original plan was for Osowski and Wawrzyniakowski alone to conduct the search. Although this was a smaller police contingent than usual, Osowski testified that it was sufficient given that the home had been cleared and defendant arrested away from the scene. (Tr. at 35-36.) The officers completed the search at about 1:30 p.m. (Tr. at 38.) Osowski nevertheless testified that they conducted a thorough search of the residence; this despite the fact that Wawrzyniakowski was, for about ½ of that time, occupied with Haley. (Tr. at 40-41, 57.)

On cross-examination, Osowski admitted that he had gathered substantial evidence of

6

possible drug trafficking by defendant prior to executing the warrant; however, he testified that it was his intent to search for a firearm; if he found other evidence of crime during the search, he would seize it. (Tr. at 28-30.) Osowski admitted previously testifying, at a state preliminary hearing, when asked what he was looking for: "Items listed on the search warrant were firearms, ammunition and I don't know if marijuana was listed either on the face of the search warrant affidavit. I don't recall. Any evidence that may constitute evidence of a crime was looked for in that residence, along with personal identifiers to link Mr. Jones to that residence." (Tr. at 30-31.) He nevertheless denied an intent to search for evidence of crimes other than felon in possession of a firearm, including controlled substances. (Tr. at 31.) On re-direct, he testified that he did suspect that he would find marijuana in the house based on his investigation. (Tr. at 69.)

## II. APPLICABLE LEGAL STANDARDS

### A. Fourth Amendment Principles

The Fourth Amendment protects citizens from unreasonable searches and seizures. U.S. Const. amend. IV. "With few exceptions, the Fourth Amendment generally requires that the issuance of a warrant supported by probable cause precede any search." United States v. Parker, 469 F.3d 1074, 1077 (7th Cir. 2006). The Fourth Amendment's Warrant Clause further requires that any search warrant particularly describe the place to be searched and the persons or things to be seized. The manifest purpose of this particularity requirement is to prevent general searches. Maryland v. Garrison, 480 U.S. 79, 84 (1987). The primary evil posed by a general warrant "'is not that of intrusion Per se, but of a general, exploratory rummaging in a person's belongings.'" Andresen v. Maryland, 427 U.S. 463, 480 (1976)

7

(quoting Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971)). The Fourth Amendment addresses this problem by requiring a particular description of the things to be seized, which makes general searches impossible and prevents the seizure of one thing under a warrant describing another. Id.

But this does not mean that the police are precluded from seizing any evidence not listed in the warrant. If the police have a warrant to search a given area for specified objects and in the course of that search come across some other article of incriminating character in "plain view," they may seize that item. Horton v. California, 496 U.S. 128, 135 (1990); see also id. at 136 (explaining that in order for the plain view exception to apply, the police must be lawfully located in the place from which the evidence could be plainly viewed, and its incriminating character must also be immediately apparent). The prohibition against general searches and general warrants, which serves primarily as a protection against unjustified intrusions on privacy, is not offended in those circumstances because the warrant already provides the officer a right of access to the place; the exception merely authorizes the officer to seize the incriminating item without a warrant. See id. at 141-42. Further, because Fourth Amendment standards are objective, the fact that the executing officer is interested in finding some other, unlisted item of evidence (and fully expects to find it in the course of a search) will not invalidate its seizure if the search is confined in area and duration by the terms of a warrant. See id. at 138; see also United States v. Van Dreel, 155 F.3d 902, 905 (7th Cir. 1998) (finding irrelevant the subjective intent of drug task force officers, who assisted in the execution of a search warrant relating to suspected hunting violations, to use the warrant as a pretext for searching for drug evidence).

However, if the scope of the search exceeds that permitted by the terms of a validly

8

issued warrant, any subsequent seizure is, without more, unconstitutional. Horton, 496 U.S. at 140. "While this does not mean that every police action while inside a home must be explicitly authorized by the text of the warrant, the Fourth Amendment does require that police actions in execution of a warrant be related to the objectives of the authorized intrusion." Wilson v. Layne, 526 U.S. 603, 611 (1999) (internal citations omitted). In Wilson, for instance, the Court held "that it is a violation of the Fourth Amendment for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." Id. at 614.

**B.    Remedy Principles**

Evidence seized outside the scope of a search warrant is subject to suppression, unless the government can demonstrate the applicability of some exception to the exclusionary rule, see United States v. Stefonek, 179 F.3d 1030, 1033 (7th Cir. 1999), such as "inevitable discovery," see id. at 1035. Under the inevitable discovery doctrine, if the government can prove by a preponderance of the evidence that the evidence ultimately or inevitably would have been discovered by lawful means then the deterrence rationale animating the exclusionary rule loses its force, and the evidence should be received. Nix v. Williams, 467 U.S. 431, 444 (1984); see also United States v. Jones, 72 F.3d 1324, 1334 (7th Cir. 1995).

The inevitable discovery doctrine has been applied in cases where the police unreasonably executed a search warrant. See, e.g., United States v. Morris, 349 F.3d 1009, 1013 (7th Cir. 2003) (approving seizure of guns, despite unreasonable use of a "flash-bang device," because the officers inevitably would have seized the contraband pursuant to the search warrant); United States v. Langford, 314 F.3d 892, 894 (7th Cir. 2002) ("As we said in United States v. Jones, 149 F.3d 715, 716-17 (7th Cir. 1998), and now elevate to a holding, 'it

9

is hard to understand how the discovery of evidence inside a house could be anything but "inevitable" once the police arrive with a warrant.'"); United States v. Espinoza, 256 F.3d 718, 727-28 (7th Cir. 2001) (declining to exclude evidence based on officers' violation of the "knock and announce" rule). However, the mere existence of a warrant (or some comparable showing of probable cause) does not establish inevitable discovery, United States v. Brown, 64 F.3d 1083, 1085 (7th Cir. 1995); the government must still show that the lawful search, in fact, would have occurred, United States v. Cotnam, 88 F.3d 487, 496 (7th Cir. 1996).

### III.  DISCUSSION

In the present case, it is undisputed that the officers lawfully entered defendant's residence pursuant to a valid search warrant. It is also undisputed that they seized the drug evidence in the course of executing that warrant, from areas in which the items listed in the warrant could be found, and that the incriminating nature of the drugs was immediately apparent. The officers may have expected to find drugs – indeed, they may have actively looked for them – but their subjective motives matter not. Thus, Horton would appear to doom defendant's motion.

However, defendant argues that the use of the drug-sniffing dog violated his Fourth Amendment rights because it transformed a firearms search warrant into a general search warrant. He notes that the warrant listed only firearms, firearms-related evidence, and indicia of occupancy, and since the dog's only role was to search for drugs, the dog's use was not related to the objectives of the authorized intrusion. See Wilson, 526 U.S. at 611.

However, defendant has no good answer for the Supreme Court and Seventh Circuit's dog-sniff cases. The Justices have held that official conduct which compromises no legitimate interest in privacy is not considered a search subject to the Fourth Amendment. Illinois v.

Caballes, 543 U.S. 405, 408 (2005). Accordingly, because any interest in possessing contraband cannot be deemed "legitimate," a sniff performed by a well-trained narcotics-detection dog – which reveals only the possession of contraband – does not implicate the Fourth Amendment. Id. at 408-09. Thus, in Caballes, the Court upheld the use of a drug-detection dog to sniff a vehicle during a traffic stop, even in the absence of reasonable suspicion that the driver possessed drugs. Id. at 407-09; see also United States v. Place, 462 U.S. 696, 707 (1983).

In United States v. Brock, 417 F.3d 692 (7th Cir. 2005), the Seventh Circuit extended Caballes to the use of a dog inside the home. In that case, pursuant to the consent of the defendant's roommate, officers engaged in a drug investigation entered the common area of a house in which the defendant rented a room. The officers summoned a dog to corroborate the presence of narcotics, and the dog alerted on the defendant's locked bedroom door. Armed with this and other information, the officers obtained a search warrant for the defendant's room, pursuant to which they seized drugs. Id. at 693-94. The defendant argued that the canine sniff constituted an illegal warrantless search, and that the search warrant issued in reliance on that sniff violated the Constitution. He attempted to distinguish Caballes and Place on the ground that he had a far greater privacy interest inside his home than one has in a public space or in a car. Id. at 695. The court rejected the argument, holding "that the dog sniff inside Brock's residence was not a Fourth Amendment search because it detected only the presence of contraband and did not provide any information about lawful activity over which Brock had a legitimate expectation of privacy." Id. at 696. The court concluded:

> Critical to our holding that the dog sniff in this case was not a Fourth Amendment search is the fact that police were lawfully present inside the common areas of the residence with the consent of Brock's roommate. While Brock contends that

11

he had a legitimate expectation that the contents of his locked bedroom would remain private, he does not contest in any meaningful way [the roommate's] authority to allow police inside the common areas of their shared home. . . . Once [the roommate] authorized the police to explore the common areas of [the house], the entry of a narcotics-sniffing dog into that space did not infringe on any legitimate privacy interest. Everything behind Brock's locked bedroom door remained undetected except the narcotics, which Brock had no right to possess in the first place. The dog sniff from the common area of defendant's residence, where police were present by consent, did not violate defendant's Fourth Amendment rights, and the district court did not err in denying Brock's motion to suppress.

Id. at 697.

As in Brock, the officers in the instant case were lawfully present inside defendant's residence, and Emo's sniffs revealed nothing more than marijuana, which defendant had no right to possess. It is true that the police in Brock were conducting a drug investigation and summoned the dog to assist in that endeavor. In the present case, the warrant targeted guns, and, given the nature of his training, Emo could not directly assist the officers in finding firearms. However, Caballes rejected any requirement that a dog sniff be related to the initial purpose of the law enforcement encounter, requiring only that the entire encounter be reasonable. In Caballes, the police stopped the defendant for speeding, and the Court proceeded on the assumption that the officer conducting the dog sniff had no information about possible drug violations. Id. at 407. The Court continued:

It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution. A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission. In an earlier case involving a dog sniff that occurred during an unreasonably prolonged traffic stop, the Illinois Supreme Court held that use of the dog and the subsequent discovery of contraband were the product of an unconstitutional seizure. We may assume that a similar result would be warranted in this case if the dog sniff had been conducted while respondent was being unlawfully detained.

12

> In the state-court proceedings, however, the judges carefully reviewed the details of [the officer's] conversations with respondent and the precise timing of his radio transmissions to the dispatcher to determine whether he had improperly extended the duration of the stop to enable the dog sniff to occur. We have not recounted those details because we accept the state court's conclusion that the duration of the stop in this case was entirely justified by the traffic offense and the ordinary inquiries incident to such a stop.
>
> Despite this conclusion, the Illinois Supreme Court held that the initially lawful traffic stop became an unlawful seizure solely as a result of the canine sniff that occurred outside respondent's stopped car. That is, the court characterized the dog sniff as the cause rather than the consequence of a constitutional violation. In its view, the use of the dog converted the citizen-police encounter from a lawful traffic stop into a drug investigation, and because the shift in purpose was not supported by any reasonable suspicion that respondent possessed narcotics, it was unlawful. In our view, conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, unless the dog sniff itself infringed respondent's constitutionally protected interest in privacy. Our cases hold that it did not.

Id. at 407-08 (internal citations omitted); see also United States v. Taylor, 596 F.3d 373, 376-77 (7th Cir.) (holding that police questioning unrelated to the initial purpose of the seizure does not implicate the Fourth Amendment, so long as it does not unreasonably extend the encounter), cert. denied, 130 S. Ct. 3485 (2010).

Thus, under Caballes, the use of a drug-sniffing dog does not change the nature of an encounter in a constitutional sense, so long as the entire encounter remains reasonable. And so the cases hold. For example, in United States v. Reed, 141 F.3d 644 (6th Cir. 1998), police responding to a burglar alarm at the defendant's home obtained the defendant's consent to send in a dog to find the burglars. Unbeknownst to the defendant, the dog was also trained to search for drugs, and he alerted on cocaine in a dresser drawer. Id. at 646-47. Based on the dog's discovery, officers obtained a search warrant and seized the drugs. Id. at 647-48. The defendant argued that when the dog opened the dresser drawer he exceeded the scope of the consent to search for intruders. The court agreed that a consent search is circumscribed

13

by the object of the search, but noted that the police are permitted to seize incriminating objects in plain view. Id. at 649 (citing Horton, 496 U.S. at 135). The court further noted that, under Supreme Court precedent, a canine sniff does not unreasonably intrude upon a person's reasonable expectation of privacy and thus does not constitute a search under the Fourth Amendment. Id. (citing Place, 462 U.S. at 706-07). Like the Seventh Circuit later would in Brock, the Sixth Circuit in Reed rejected the notion that the dog sniff cases were limited to "public sniffs." Id. at 650. The court concluded that because the canine team was lawfully present in the defendant's home, either due to the pursuit of a burglar or the defendant's consent, any contraband sniffed by the dog fell within the "plain-view" doctrine or the "canine-sniff" rule. The court thus found that no illegal search occurred, even if the dog moved the drawers. Id.

In United States v. Meindl, 83 F. Supp. 2d 1207 (D. Kan. 1999), officers entered the defendant's home to arrest him on a misdemeanor warrant. Believing that the defendant may be armed and hiding on the second floor, the officers sent a dog upstairs. The officers heard the dog bumping or knocking something around, went upstairs, and saw the dog pawing a plastic bowl containing suspected cocaine. Id. at 1210-11. The defendant conceded that the officers lawfully entered his home pursuant to the arrest warrant, but argued that the dog's actions in knocking over the bowl and exposing its contents constituted a search without probable cause. Id. at 1216. The court found that the officers acted reasonably in calling a canine unit, and that the officers did not permit the dog to remain upstairs alone for any period longer than reasonably necessary to follow through with the command to search for a person. Id. The court further found the plain view exception applicable, rejecting the notion that Place and its progeny were limited to sniffs conducted in public places. Id. Finally, the court rejected

the notion that the canine sniff for drugs became a search because it happened by chance during a constitutionally proper search for a person inside a home. Id. at 1217.

In Smithson v. State, 621 S.E.2d 783 (Ga. Ct. App. 2005), officers obtained a search warrant to look for stolen cell phones. The officers also suspected that the target possessed drugs, but they did not include such information in the warrant application. The officers entered the home to execute the warrant, stationing a K-9 officer in the rear to prevent anyone from fleeing. Upon entering, the officers observed drug paraphernalia, brought the dog inside to conduct a "free air search," and with the dog's help located cocaine in various places. Id. at 785. The defendant argued that the officers exceeded the scope of the search warrant by utilizing a drug dog to conduct an exploratory search for contraband. Id. at 787-88. He claimed that the plain view exception did not apply because the drugs were located, not inadvertently during the warrant-authorized search, but solely because of the assistance of the drug dog. The court rejected the argument, noting that the Supreme Court dispensed with the inadvertence requirement in Horton. Id. at 788. Horton further held that "'the fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement.'" Id. at 788 (quoting Horton, 496 U.S. at 138). The Smithson court thus found irrelevant the fact that the officers expected to find drug evidence; so long as the search warrant was valid and the search was confined in area and duration, the drug evidence could be received. Id. The court then found the search warrant valid, thus entitling the officers to enter the defendant's residence, and accepted the trial judge's findings that the officers observed the drug paraphernalia while properly executing the warrant, triggering the officers' suspicion that drugs were present; that the drugs were found

in locations where cell phones could have been hidden; and that the "plain view" exception applied because the officers were on the premises legally. Id. at 788-89; see also Amir v. State, No. 01-99-00640, 2002 WL 58571, at *4 (Tex. Ct. App. Jan. 17, 2002) (holding that the presence of a drug-sniffing dog did not enlarge the scope of a search warrant).

Ultimately, as Caballes and the other cases cited above confirm, the touchstone is reasonableness, and I find that the officers acted reasonably in the present case. The dog was present inside the home for just fifteen minutes and thus did not extend the duration of the search; he "searched" only those areas in which the items listed on the warrant could be found and thus did not exceed the authorized scope of the search; and he remained leashed and did not bark at or otherwise menace Haley and her child or damage property inside the home. In sum, the presence of the dog did not in any way elevate the level of the intrusion. Further, the evidence shows that use of the dog was not pre-planned. Officer Smith and Emo traveled to the residence and offered to assist on their own initiative, not based on a request by Osowski. And, Osowski decided to employ the dog only after he observed a scale and drug residue in plain view during his initial sweep of the residence.

Let me be clear, however. I do not endorse the use of a drug-sniffing dog whenever the police obtain a search warrant listing non-drug-related items. I hold only that, under the particular circumstances of this case, the police did not act unreasonably in using the dog. Accordingly, the motion to suppress must be denied.[2]

---

[2]The Seventh Circuit has recognized that officers must be afforded some leeway in executing search warrants. See United States v. Aljabari, 626 F.3d 940, 947 (7th Cir. 2010). Just because a court later concludes that the officers exceeded the scope of the warrant does not require that any evidence gathered be suppressed, so long as it was reasonable for the officers to believe, at the time, that their actions were authorized. See id. Further, the good faith doctrine may apply in circumstances where officers mistakenly exceed the scope of a

16

Alternatively, I conclude that the evidence need not be suppressed, even if the police violated the Fourth Amendment by using the dog, because the government clearly demonstrated that the police would have inevitably discovered the marijuana pursuant to the search warrant. At the evidentiary hearing, Osowski testified that when executing a search warrant he looks in every container where the subject evidence might be found. The warrant in this case also listed indicia of occupancy, and Osowski testified that he looks for such identifiers linking the suspect to the residence by checking the garbage for old bills, receipts, or anything with the target's name on it. He testified that in this case he searched the garbage cans in rooms other than the master bedroom, and that he would have searched the container in that room as well even if the dog had not alerted on it. He further testified that he had not yet searched that container at the time the dog hit on it. I found Osowski's testimony credible.

Defendant argues that I should not accept the notion that whenever the police have a search warrant anything they recover may be admitted under the inevitable discovery doctrine. I have not done so. Rather, I have applied the doctrine based on Osowski's clear and credible testimony that he would have searched the areas in which the drugs were found even if the dog had not been presented and alerted on those areas. Although the subjective motives of the police are generally irrelevant to Fourth Amendment analysis, I also find, based on Osowski's testimony, that the officers did not intentionally omit drug evidence from the warrant with the

---

search warrant. See United States v. Jefferson, No. 09-CR-18, 2009 WL 3617729, at *4 n.2 (E.D. Wis. Oct. 29, 2009). In the present case, defendant has cited no case holding that use of a drug-sniffing dog under similar circumstances violates the Fourth Amendment. Thus, it is hard to see how the officers' actions could be called unreasonable or their reliance on the warrant bad faith. It also worth noting that in Wilson, the case defendant most directly relies upon, the Court stated: "We have no occasion here to decide whether the exclusionary rule would apply to any evidence discovered or developed by the media representatives." 526 U.S. at 614 n.2.

17

intent of searching for it anyway.

Relying on the magistrate judge's recommendation, defendant argues that inevitable discovery is speculative here, and that the items listed in the warrant had already been found when the dog entered. But it was because the record before the magistrate judge on these issues was incomplete that I held an evidentiary hearing. At that hearing, the government clearly demonstrated that the drug evidence would have been discovered even if the dog had not been present, and that, in fact, the search had not been completed at the time the dog entered the house. Just because <u>some</u> of the items listed on the warrant had been found did not require the officers to pack up and leave.

Defendant argues that the circumstances cast doubt on Osowski's testimony that a thorough search was (or would have been) completed; just two officers participated, and the home contained many nooks and crannies to be checked. But I see no reason why Osowski would not have searched the garbage can in the master bedroom – the room where the gun was found – in order to further link the firearm to defendant, or that he would not have checked the living room area where he initially saw the scale and residue. That the officers may not have checked every inch of the house casts no doubt on Osowski's testimony that he would have checked the areas where the drugs were found.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion to suppress (R. 8) is **DENIED**.

**IT IS FURTHER ORDERED** that this matter is scheduled for **STATUS** on **Friday, February 4, 2011, at 10:15 a.m.**

Dated at Milwaukee, Wisconsin, this 26th day of January, 2011.

/s Lynn Adelman
_____
LYNN ADELMAN
District Judge